**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION**

| | | |
|---|---|---|
| **LESSLIE RIVERA, INDIVIDUALLY AND A/N/F OF A.K.R., MINOR; AND MICHAEL RIVERA,** | § § § § | |
| Plaintiffs, | § § | **CIVIL ACTION NO.** |
| vs. | § § § | |
| **JUAN M. GARZA individually, and in his official capacity, GEORGE MICHAEL POTTER, ROGER DELAROSA, JONATHAN MONTANA VILLARREAL, HERACLIO CHAVEZ, MARIA VIRGINIA RODRIGUEZ, all in their individual and in their official capacities; THE CITY OF HOUSTON; JOHN DOE AND JANE DOE,** | § § § § § § § § § § | **JURY DEMANDED** |
| Defendants. | § § | |

---

**PLAINTIFFS' ORIGINAL COMPLAINT**

---

**COME NOW** Plaintiffs, **LESSLIE RIVERA**, Individually and a/n/f of A.K.R., Minor, and **MICHAEL RIVERA**, and file this, their Original Complaint, and for cause of action would respectfully show as follows:

**I.**

**INTRODUCTION**

Once again, the Houston Police Department and several of its armed officers have failed to protect residents of the city and their property, in this case a beloved family dog. On January 10, 2019, an HPD officer which, based on information and belief, is Juan M. Garza, shot his duty weapon several times at a German Shepherd dog named "Max" who was over 30 feet away,

1

striking it. Standing next to the dog, was Lesslie Rivera who had her two-year-old baby girl in her arms. The gun shots were intentionally and maliciously aimed at Max, the dog. But Lesslie and her baby were next to Max and tragically one of the bullets wounded Lesslie in her right arm. Ms. Rivera and her baby were severely traumatized by this incident and now both suffer from an acute case of Post-Traumatic Stress Disorder (PTSD). The dog was wounded and bleeding and had to be surgically intervened. He died later that day during surgery, according to the authorities. The family dog was primarily owned by Lesslie's younger brother, Michael Rivera. He was the dog's trainer and caretaker since Max was a puppy.

The HPD officers were at their home as part of a joint Task Force comprised of DEA, ICE, and FBI agents. They were there to arrest Lesslie's father. They already had Lesslie's father in custody, and were in the front yard of the house, when the HPD officer shot at the dog. The dog was not attacking the officers when he got shot but was sitting beside Lesslie attempting to protect her and her baby. The dog, Lesslie and her baby girl were in the backyard, approximately 35 feet away from where the officers were standing, and an iron fence separated them from the front year where the Task Force was finalizing the arrest. The Task Force members were not in any real danger of being injured by the dog when the HPD officer took a round of shots aimed at the dog, near where Lesslie and baby were standing. The mom and baby were not a threat to them either; they were simply watching the arrest from afar. No drugs or weapons were ever found in the home following the man's arrest.

Instead of enduring violence and gun shots, Lesslie and her baby should have been protected from harm. The gun shots aimed in their direction were legally and morally unjustified. The police failed the Plaintiffs and violated their legal and constitutional rights. The police officers and the City of Houston are liable under the laws and Constitution of the United States for all the damages they caused to the Plaintiffs. Lesslie, the baby and the dog were innocent

2

bystanders. The arrest operation that had absolutely nothing to do with them.

Worse yet, HPD officers at the hospital falsely informed Lesslie that she was "under arrest," but in reality, no charges were ever brought against her. And HPS officers also forced her to fill-out a hand-written statement while she was in the hospital using her injured arm, even though she was in severe pain. The officers easily could have used a video or audio recorder instead, so there was no need to lie to her or forcer her to endure more pain. Her brother, Michael, was also falsely informed he was under "arrest," when he has never committed any crime.

HPD officers have tremendous power to harm and kill—people and animals. When heavily armed police officers cause harm or death to innocent bystanders, who are not guilty of any crime, they should be punished and disciplined. Police officers need to be accountable for their actions, but sadly in the City of Houston accountability has been absent for a very long time. As the Fifth Circuit Court of Appeals long ago expressed:

> "With any abuse of authority, the entire ordering process is weakened. The public trusts the entire process less, and antagonism to all figures of authority rises. No one should be more alert to the cost of failure than responsible law enforcement officers …. We must do what we can to avoid the failures, to prevent their reoccurrence, and —at all times— stay true to the requisites of honesty and accountability imposed upon all who are at once representative of the law and subject to it."

*Grandstaff v. Borger*, 767 F.2d 161, 166 (5th Cir. 1985).

## II.
## PARTIES

1.      Plaintiff, **LESSLIE RIVERA**, lives at 7711 Greenstone Street, Houston, Texas 77087, in Harris County, Texas, which is a part of the Southern District of Texas (hereinafter, "Lesslie").

3

2.      Plaintiff, **A.K.R.**, is a minor, and the daughter of Lesslie Rivera, who lives with her mother at 7711 Greenstone Street, Houston, Texas 77087.

3.      Plaintiff, **MICHAEL RIVERA.**, lives at 7711 Greenstone Street, Houston, Texas 77087, in Harris County, Texas, which is a part of the Southern District of Texas (hereinafter, "Michael"). He was the owner of the German Shepherd named "Max."

4.      Defendant **CITY OF HOUSTON** (hereinafter, "the City") is a Texas municipal corporation that operates the division known as the Houston Police Department (the "HPD" or "Department"), which in turn sets city-wide policy for police officers employed by the Department.

5.      Defendant, **JUAN M. GARZA** (hereinafter, "Officer Garza"), is a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as an HPD officer. Officer Garza is sued in his individual capacity and official capacity. He is currently working for HPD out of the Southeast Patrol Station located at 8300 Mykawa Rd, Houston, TX 77048. He may be served there.

6.      Defendant, **GEORGE MICHAEL POTTER** (hereinafter, "Officer Potter"), is an HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as an HPD officer. He is sued in his individual capacity and official capacity. Based on information and belief, and subject to discovery in this case, Officer Potter may have discharged his weapon causing damages to Plaintiffs in this case and/or also falsely arrested Plaintiffs. He is currently working for HPD out of the South Gessner Patrol Station located at 8605 Westplace Dr, Houston, TX 77071. He may be served there.

7.      Defendant, **ROGER DELAROSA** (hereinafter, "Officer Delarosa"), is an HPD officer who, at all times relevant to this action, was acting under color of law and within the

scope of his employment as an HPD officer. He is sued in his individual capacity and official capacity. Based on information and belief, and subject to discovery in this case, Officer Delarosa may have discharged his weapon causing damages to Plaintiffs in this case and/or falsely arrested Plaintiffs. He is currently working for HPD in the Internal Affairs Division located at 1200 Travis Street, Houston, TX. He may be served there.

8.     Defendant, **JONATHAN MONTANA VILLARREAL** (hereinafter, "Officer Villarreal"), is a Houston Police Department officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Houston Police Department officer. Based on information and belief, and subject to discovery in this case, Officer Villarreal may have discharged his weapon causing damages to Plaintiffs in this case and/or falsely arrested Plaintiffs. He is currently working for HPD in the Narcotics Division located at 1200 Travis Street, Houston, TX 77002. He may be served there.

9.     Defendant, **HERACLIO CHAVEZ** (hereinafter, "Officer Chavez"), was an HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as an HPD officer. Based on information and belief, and subject to discovery in this case, Officer Chavez may have discharged his weapon causing damages to Plaintiffs in this case and/or falsely arrested Plaintiffs. He is sued in his individual capacity and official capacity. He is currently working for HPD in the Narcotics Division located at 1200 Travis Street, Houston, TX 77002. He may be served there.

10.     Defendant, **MARIA VIRGINIA RODRIGUEZ** (hereinafter, "Officer Rodriguez"), is an HPD officer who, at all times relevant to this action, was acting under color of law and within the scope of her employment as an HPD officer. Based on information and belief, and subject to discovery in this case, Officer Rodriguez may have discharged her weapon

causing damages to Plaintiffs in this case and/or falsely arrested Plaintiffs. She is sued in her individual capacity and her official capacity. Based on information and belief, she is currently working for HPD in the Narcotics Division located at 1200 Travis Street, Houston, TX 77002. She may be served there.

11.     Defendant, **JOHN DOE**, is a person legally responsible to the Plaintiffs for the damages pled herein, but because his official and legal identity are not currently known, the Plaintiffs shall designate him as "John Doe" and, as soon as disclosures and/or discovery is provided to the Plaintiffs under the Federal Rules of Civil Procedure, this Defendant shall be designated by his proper name.

12.     Defendant, **JANE DOE**, is a person legally responsible to the Plaintiffs for the damages pled herein, but because her official and legal identity are not currently known, the Plaintiffs shall designate her as "Jane Doe" and, as soon as disclosures and/or discovery is provided to the Plaintiffs under the Federal Rules of Civil Procedure, this Defendant shall be designated by her proper name.

### III.
### JURISDICTION AND VENUE

13.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §1331, because the claims involve a question of federal law under 42 U.S.C. §1983 and the U.S. Constitution.

14.     The Plaintiffs also invoke the Court's supplemental jurisdiction, under 28 U.S.C. § 1367, to bring causes of action against the Defendants under Texas law.

15.     Venue is proper in this cause in the Southern District of Texas pursuant to 28 U.S.C. §1391(a)(2) because all or substantial part of the events which gave rise to these causes of action occurred in the Southern District of Texas.

## IV.

## FACTUAL ALLEGATIONS

### Defendant Officer Garza and Others Worked as HPD Officers

16.     On January 10, 2019, Officer Garza was a full-time officer for HPD, and based on information and belief, assigned to work the Narcotics Division. Based on information and belief, at the time of the facts stated herein, he was the officer who discharged his duty weapon causing damages to the Plaintiffs. At the time of the facts stated herein, he was assigned to the Southeast Patrol Division. Based on information and belief, he was sworn in as an HPD officer in April 2015.

17.     At the time of the facts stated herein, Officer Garza and all other named HPD officers in this case were working to enforce all federal, state, and city laws with approval from HPD and with the training, or lack thereof, provided by HPD.

18.     Based on information and belief, the named HPD officers were assisting federal law enforcement authorities as part of a special "Task Force," including agents of the U.S. Drug Enforcement Agency ("DEA"), the U.S. Immigration and Customs Enforcement ("ICE") and/or the Federal Bureau of Investigation ("FBI").

19.     To that end, the HPD officers named as Defendants in this case, including Officer Garza, were all wearing their Department-issued uniform, wearing an HPD badge and/or logos, and were all armed with their service weapon, and acting in a full capacity as HPD officers.

20.     The City of Houston was the employer of the named officers.

### December 2018 Arrest Warrant Issued Against Plaintiffs' Father, Mario Rivera Pizano

21.     The Plaintiffs, Lesslie and Michael, have a father who was arrested on January 10, 2019.

22.     On or about December 20, 2018, a U.S. Magistrate Judge of the U.S. District

7

Court for the Southern District of Texas—Houston Division, issued an arrest warrant (the "Arrest Warrant") against Mr. Mario Rivera Pizano (aka "Mario Pizano Rivera", aka "Paleta")(hereinafter, "Mario"), in criminal case No. 4:18-cr-00721.

23.     Mario's date of birth is July 6, 1977.

24.     Mario was indicted on federal charges of conspiracy and possession of a controlled substance with the intent to distribute controlled substances (regarding facts that took place on or about May 2018), and additional federal charge of assault on a federal officer (on or about May 2018). Besides Mario, no charges have ever been brought against the Plaintiffs.

25.     In the morning hours of January 10, 2019, a task force comprised of HPD officers, DEA, ICE and FBI agents (hereinafter, the "Task Force") arrived at 7711 Greenstone Street, Houston, Texas (hereinafter, "the Home") to execute said Arrest Warrant against Mario.

26.     Based on information and belief, prior to executing the Arrest Warrant against Mario, members of the Task Force surveyed the location, or the Home, where Mario's arrest would take place to determine the number of occupants in the buildings at said location, and to assess any propensity for danger, such as dogs.

27.     Based on information and belief, prior to executing the Arrest Warrant against Mario, and upon concluding the surveillance of the location of the arrest (the Home) members of the Task Force established an entry plan to determine when and how it would be best to enter the Home.

28.     Additionally, based on information and belief, in May of 2018, Mario had been previously detained by authorities at the same Home and was later released after interrogating him and finding no wrongdoing.

29.     Mario was not criminally charged in May of 2018. He was instead released.

30.     The fact that authorities had previously been to Mario's Home in May 2018 simply means they did not have to engage in any guesswork about who lived there or any potential risks they may face, including the presence of dogs, if the authorities ever went back, as they did in January of 2019.

31.     Based on information and belief, for the arrest of January 10, 2019, the Task Force had decided that some members of the Task Force would arrive at the Home to execute said Arrest Warrant, while others would at the same time follow Mario's wife and his young son, Michael Rivera, the co-plaintiff, who were driving to school at that time in the morning.

### The Task Force Enters the Home and Arrests Mario

32.     On January 10, 2019, at approximately 7:50am, numerous members of the Task Force surrounded the Home from the front and sides, including the HPD officers who are named defendants in this case.

33.     The location of the arrest (the Home) has cyclone fencing on the sides and back of the property lot.

34.     The location of the arrest of January 10, 2019, took place at the Home which is located in the Houston neighborhood known as "Golfcrest," a small neighborhood tucked between the 610 Loop and Interstate 45 in Southeast Houston.

35.     Below is a picture of the Home where the Arrest Warrant on Mario took place on January 10, 2019:



36.     The location of the arrest (the Home), shown above, also had a black iron gate on the driveway.

37.     The Home's driveway, which is built of concrete, extends from the city street to the backyard of the house, and has the black iron gate that divides and separates the concrete driveway between the Home's front yard and the backyard.

38.     This is the black, iron gate on the driveway (hereinafter, the "Iron Gate"):



39.     In addition to the Iron Gate, shown above, the property lot has two, single-family housing units. One in the front, which is the main, larger house; and other smaller home unit, which is built on the backyard, behind the main house, as can be seen above.

40.     Mario lived with his wife in the small house in the back of the lot.

41.     Lesslie and Michael lived in the larger house, in the front section of the lot.

42.     When the members of the Task Force arrived at the Home to execute the Arrest Warrant, they surrounded the Home, and entered other properties around the perimeter to do so.

43.     The members of the Task Force were heavily armed with weapons.

44.     As they approached the Iron Gate from the front yard, they immediately made contact with Mario, the suspect, who was walking outside of the house, behind the Iron Gate.

45.     Before the agents opened the Iron Gate to arrest Mario, they saw the young German Shepherd dog was also walking in the yard, behind the Iron Gate.

46.     There was another, older dog laying down next to the house, also behind the Iron Gate.

47.     Mario received specific instructions to place the German Shepherd inside the house.

48.     Mario then placed the German Shepherd inside the large house and closed the door.

49.     After Max the dog was placed inside the house, and the door was closed, Mario proceeded to voluntarily surrender to the agents.

50.     The members of the Task Force opened the Iron Gate and took Mario into custody.

51.     After Mario was placed under custody the arresting agents brought him to the front yard.

52.     Mario voluntarily surrendered and did not resist arrest nor pulled away from the HPD officers who are named defendants in this case.

53.     Mario was placed under arrest by placing handcuffs on him.

54.     With Mario secure and in custody, the members of the Task Force moved to the front yard and closed the Iron Gate behind them.

55.     Mario was in custody, in the front yard, when his daughter Lesslie appeared through the back door of the house, and stood in the backyard, near the corner of the house, looking at her father from afar.

56.     Lesslie had her two-year-old baby in her arms while standing in the backyard.

57.     Lesslie wanted to watch her father's arrest and comfort him with words from afar, telling him that everything was going to be okay.

12

58.     Lesslie was able to see her father in custody, with handcuffs securely placed on his hands, standing in the front yard surrounded by members of the Task Force, on the other side of the Iron Fence.

59.     Lesslie also made sure to tell the members of the Task Force that seconds before had arrested her father that she had no weapons or drugs on her or in her home.

60.     Lesslie also told the Task Force agents, who were 35 feet away from her, that the only other people in the house at that time were her and her baby girl.

61.     The Task Force was not there to arrest Lesslie.

62.     There was no arrest warrant issued against Lesslie.

63.     Lesslie was not a suspect of any crime or a target of the Task Force.

64.     Lesslie had her two-year old baby, the minor A.K.R., and was carrying her using her left arm, as she stood in the backyard watching her dad being arrested.

65.     Then suddenly Max appeared from behind in the backyard and quickly approached Lesslie.

66.     Lesslie told Max to stay and the dog immediately obeyed her command and sat next to her but began barking.

67.     As Lesslie was standing there, near the back door, she also kept telling her father, in Spanish, that everything was "going to be okay" and "not to worry."

68.     Second later a round of bullets was fired in the direction of the dog, Lesslie and the baby.

69.     Lesslie was shot with a bullet in her right arm by an HPD officer, believed to be either Officer Garza and/or possibly one of the other HPD officers named as defendants in this action.

70.    Based on information and belief, Officer Garza fired five or six rounds towards the backyard while he was in the front yard, and pointing his gun thorough the Iron Fence.

71.    Based on information and belief, Officer Garza was standing approximately 35 feet away from where the victims were, in the backyard.

72.    Max was also wounded by the gun shots and immediately began crying and running around in pain, and eventually ran to the back of the house and crawled back inside the house through a window.

73.    Pictures taken of the scene showed bloody dog paw stains on the wall and window where Max crawled back into the Home.

74.    The police investigation later revealed that Max had, in fact, escaped the Home through that window, moments before he was wounded by gun shots fired at him by the Defendants.

75.    As soon as Lesslie was shot, she began bleeding profusely and walked from the backyard to the driveway carrying her baby girl in her other arm, and then collapsed on the cement driveway, seriously injuring her spine and neck.

76.    Lesslie's baby girl was still in her arms when she fell to the ground, and began crying hysterically after seeing Max was hurt, crying, barking and running around in intense pain.

77.    Lesslie's baby girl also became stained with her mother's blood.

78.    To this day, the baby girl, A.K.R., is so traumatized by this violent event that she refuses to interact with dogs, and still mentions "Max."

79.    Before that day, the minor, A.K.R., loved to play with Max and the other family dog, without any issues.

80.     As she fell to the floor, behind the Iron Gate, Lesslie began asking for an ambulance, but the police officers who are defendants in this case initially refused her request.

81.     The officers denied that they had shot at her and accused her of falling to the ground.

82.     Lesslie then begged them to allow her to go inside her house to get a bandage on her arm to stop the bleeding, but they said no and ordered her to stay on the floor.

83.     Lesslie was in shock.

84.     Lesslie then began asking who had shot her, but the Defendants said no one had shot her.

85.     It was not until much later that the Defendants decided to reverse course and allow Lesslie to be medically examined by paramedics, and eventually be taken to the hospital.

86.     The HPD officers who are named-defendants later told Lesslie she was under "arrest," which was not true.

87.     Lesslie was treated like a criminal by the Defendants, even though she was innocent of any wrongdoing and she was the true victim.

88.     The Defendants later forced Lesslie to fill-out a hand-written statement about the incident, while she was still in the hospital being treated for her bullet wound. They forced her to use her injured right arm, even though she was in severe pain.

89.     The officers easily could have used a video or audio recorder instead to take Lesslie's statement about the shooting.

90.     There was absolutely no need to have Lesslie use her right hand to write a statement and endure more physical pain while at the hospital.

91.     The City of Houston has a history of police abuse and brutality against residents

15

of the city, by HPD officers.

92.     The City of Houston and HPD police officers have a history of reckless disregard for human life and safety.

93.     In the past few years, it has been prevalent conduct among the city's police to unnecessarily, maliciously and recklessly use force to threaten the life and security of those whom they encounter.

94.     The reckless and intentional abuse of force by HPD officers is directly attributable to the training or instruction or example or acceptance of or by the city's policy-makers.

95.     The City of Houston's policies are the reason and cause of the damages suffered by Plaintiffs.

96.     Based on information and belief, the City of Houston does the properly or sufficiently train its police officers to reasonably and safely deal with animals when conducting searches or arrests.

97.     The City of Houston has policies in place regarding the use of force by HPD that constitute a repudiation of the constitutional rights of city residents.

98.     The policies of the City of Houston were the cause of the constitutional violations and deprivation of rights suffered by Plaintiffs.

99.     The City of Houston does not properly or sufficiently train its police officers to properly plan for arrests involving canines, and does not teach them to deal with such contingencies.

100.    The City of Houston and its officers took the life of Max, the dog, without due process of law.

101.    The City of Houston and its officers unjustifiably took the liberty, freedom and

16

property of the Plaintiffs without due process of law.

102.    The City of Houston and the HPD officers sued in this case are jointly and severally liable for all of the harm and damages caused to the Plaintiffs.

103.    The City of Houston does not provide adequate training to HPD officers concerning the use of force, especially when dealing with or encountering canines.

104.    The City of Houston has had to make tough choices when managing the city budget, which has significant deficits, in recent years and one of the choices it has made is to not provide training to its police officers to properly learn how to deal with canines when conducting searches or arrests.

105.    Inadequate training of police officers by the City of Houston is the reason and the cause why Plaintiffs suffered damages here.

106.    The HPD officers named defendants in this case knew at the time they were conducting the arrest of January 10, 2019, that their use of deadly force against the German Shepheard named Max was in conscious disregard of the rights and safety of innocent third parties, such as Lesslie, her baby and even other neighbors who could be seriously injured or killed.

107.    The malicious and/or reckless use of deadly force against Max would have been met, and was in fact met, with the approval of city policymakers.

108.    The policymakers in the City of Houston have, based on information and belief, done nothing to improve or correct the training of HPD officers concerning the use of deadly force against canines since January 10, 2019.

109.    The policymakers in the City of Houston have, based on information and belief, done nothing or very little to improve or correct the training of HPD officers concerning the use

of deadly force in the presence of innocent third-parties, or in residential neighborhoods, to avoid casualties or injuries to bystanders.

110. Based on information and belief, no HPD officers named as Defendants in this case have suffered any sanctions or discipline resulting from the use of firearms against Max on January 10, 2019.

111. In fact, within a few hours of the shots taken against Max and Lesslie, on January 10, 2019, HPD released a press release that was intended to justify the use of force, and cover-up any appearance of wrongdoing by the named Defendants.

112. The press release issued by the City of Houston on January 10, 2019 concerning this incident is one clear piece of evidence showing the policies in place that seek to justify the violation of constitutional rights, such as the types of violations which occurred in this case.

113. The press release issued by HPD on January 10, 2019, confirms that City of Houston policymakers approve, without exception or serious consideration, the malicious and/or reckless use of deadly force against canines and innocent bystanders and third-parties.

114. The City of Houston has repeatedly and consistently, in the past 10 years, acted with conscious indifference towards the widespread incompetence and/or misbehavior of its police officers. The City has done something that is much worse than failing to instruct or train police officers; it has adopted a discrete public policy of deliberate indifference towards abuses, incompetence and misbehavior by HPD officers.

115. The City policy has been clear and unconfined in that policymakers and decisionmakers continue to allow, indeed ordain, HPD's use of firearms upon the slightest appearance of resistance, even in the presence of only imagined justification to attack residents.

116. The City's policy seeks to employ armed officers who are willing to act recklessly

18

and maliciously, subjecting the public to the deprivation of their constitutional rights.

117.    The City's policymakers know or should know that HPD officers are more likely to shoot to kill without justification and without restraint, than not, and they do not care to change this policy.

118.    As a result, the City continues to endanger innocent third parties, as has been shown time after time, and reported in the news.

119.    Therefore, because of this, the City of Houston should be liable when the inevitable acts of unjustified use of force occur, as happened here.

120.    The City of Houston has been much more than grossly negligent in failing to properly train its police officers—it has been complicit. As a result, serious incompetence and criminal misbehavior by HPD officers is now generalized and widespread throughout the City's police force.

121.    The City policymakers and HPD's decisionmakers and leaders have repeatedly displayed an entire want of care which undoubtedly indicate that the acts or omissions in question in this case were the result of conscious indifference to the rights, welfare, and safety of the persons affected by the Defendants.

122.    The City's consciously indifferent training of its officers is the proximate cause of Plaintiffs' injuries and suffering.

123.    The use and employment of deadly force in this caser was shown to be with maliciousness and/or reckless disregard of the danger to human life, and to the life of a beloved canine.

124.    There is proof of a City policy or pre-disposition, by the policymakers and/or throughout the police force's acts, that clearly shows disregard towards human and canine lives

19

and safety.

125.    The policy and pre-disposition can, and should, be clearly inferred
circumstantially from the conduct of the HPD officers here.

126.    Plus, multiple prior incidents of abusive police conduct by HPD officers in the
past five to ten years proves there is a pattern or custom and the accession to that custom by the
City policymakers.

127.    The evidence in this case will prove repeated acts of abuse by HPD  officers the
morning of January 10, 2019, by several officers, which in turn proves a pre-disposition to
disregard human (and canine) life and safety so prevalent as to be the actual city police policy
and custom.

128.    All of the HPD officers involved in this case participated in this wild barrage,
when their exercise of the least care was displayed for all to see. Lesslie even heard several
officers fighting and arguing amongst themselves, angrily blaming the police officer that shot
Lesslie for acting stupidly and without justification when shooting his firearm towards Max,
Lesslie and her baby girl.

129.    Furthermore, in this case, the use of any rational and organized plan prior to
January 10, 2019, would have evidently avoided the death of Max, and the harm to Lesslie and
her baby.

130.    Based on information and belief, the HPD officers sued in this case did not have a
plan to deal with the contingency of a dog, and if they did it was a grossly incompetent plan.

131.    The HPD officers who are named as defendants in this case knew, or had to
know, that it was unnecessary to shoot a firearm at a dog, when using a tranquilizer would have
sufficed.

132.    The HPD officers named defendants knew, or should have known, that shooting 5 to 6 bullets in the direction of the dog could kill or injure Lesslie and her baby in the process.

133.    The pre-disposition of the City's policymaker may be inferred from the HPD officers' conduct that morning; to wit, following their incompetent and catastrophic performance, there were, based on information and belief, no reprimands, no discharges, and no admissions of error by the City officials, by HPD top brass or anyone else with supervisory power over the Defendants.

134.    Based on information and belief, neither the City nor HPD have made any changes in their policies to guard against incidents like this one, after this happened in January 10, 2019.

135.    This episode of dangerous recklessness has garnered little attention and action by the City policymakers, or by HPD's supervisors and decisionmakers.

136.    If existing policy in HPD to deal with innocent bystanders and canines during police searches and arrests was violated, as Plaintiffs believe, it would have been expected to see a different reaction by the City, instead of the false statements contained in the press release issued on January 10, 2019.

137.    If what the HPD officers did in this case, or failed to do, on January 10, 2019, was not acceptable to the police chief, Art Acevedo, then changes would have been made. Based on information and belief, no such changes were made.

**Plaintiffs Were Also Falsely Arrested by HPD**

138.    Both Plaintiffs, Lesslie and Michael, were falsely arrested by the named Defendants.

21

139.    When Lesslie was being medically treated she was told that she was under arrest, and that was not true.

140.    Lesslie was never been criminally charged for anything.

141.    There was no arrest warrant issued against Lesslie on the day her father was arrested, January 10, 2019.

142.    There has never been a federal arrest warrant issued against Lesslie before or after January 10, 2019.

143.    Lesslie was not the target of the Task Force that arrested her dad on January 10, 2019.

144.    Lesslie was not armed with any kind of weapon when she was injured with a bullet shot by an HPD officer, on January 10, 2019.

145.    Lesslie was not in possession of any controlled substance when she was injured with a bullet shot by an HPD officer, on January 10, 2019.

146.    Lesslie was holding her two-year-old baby in her left arm when she was injured with a bullet shot by an HPD officer, on January 10, 2019.

147.    No controlled substances were found in Lesslie's Home on the day of Mario's arrest, January 10, 2019.

148.    No firearms were found in Lesslie's Home on January 10, 2019.

149.    Members of the Task Force searched Lesslie's Home on January 10, 2019.

150.    Member of the Task Force searched the small housing unit in the backyard of the Home on January 10, 2019.

151.    No controlled substances were found in the small housing unit in the backyard of the Home on January 10, 2019.

152.    No firearms were found in the small housing unit in the backyard of the Home on January 10, 2019.

153.    Lesslie's brother, Michael, was also falsely arrested by the Defendants.

154.    Michael was still a young minor and a student in high school on the day of the shooting, January 10, 2019.

155.    Michael was on his way to school when members of the Task Force arrived at the Home.

156.    Michael's mom was driving him to school that morning of January 10, 2019.

157.    Based on information and belief, HPD officers had pre-planned the arrest of Michael's dad, and pre-planned the intervention with Michael's mom and with him too.

158.    Indeed, Michael's mother was driving the vehicle Michael was in, and she was taking him to school. Michael was riding as a passenger.

159.    Some of the HPD officers named as defendants in this case stopped them and proceeded to falsely accused them of running a stop sign.

160.    No ticket for traffic violations was ever issued by the HPD officers against Michael's mom or Michael.

161.    No criminal charges were ever brought against Michael's mother, or against Michael.

162.    Clearly, the HPD officers defendants in this case needed to legally justify the stopping of the vehicle in which Michael was riding in, so they lied to Michael and her mom about failing to stop at an intersection controlled by a stop sign.

163.    The HPD officers named as defendants in this case told them both to get out of the vehicle, and they were placed under arrest.

164.     When Michael and his mom asked for the reason for their arrest, the Defendants failed to give any reasonable explanation or justification.

165.     Michael was placed in handcuffs and detained.

166.     Michael was later released, without charges ever being brought against him for any reason.

167.     To this day, Michael is traumatized by this false arrest. He was made to feel like he was a "criminal" and feels stigmatized because of his false arrest.

168.     Michael suffered extreme embarrassment resulting from his false arrest, making him feel like a criminal and giving his friends and teachers the impression that he was somehow involved in criminal activity, when he was not.

169.     Michael was a good student in high school and the Defendants had no right to violate his rights in this way, causing him serious damages.

170.     Michael also lost his best friend, Max, as a result of the defendants' illegal acts, and is still suffering extreme mental anguish as a result. The taking of Max's life constitutes a violation of Michael's constitutional right to property without due process.

171.     Michael is suffering from Post-Traumatic Stress Disorder and entitled to compensation from Defendants.

172.     Michael, Lesslie and A.K.R. all suffer extremely from the loss of Max, and miss his companionship and presence in their life. The absence of Max in their lives has caused extreme pain and suffering and emotional distress on Plaintiffs, affecting their well-being.

173.     To this day, Lesslie is also traumatized by her false arrest. She was made to feel like she was also a "criminal" when she did nothing wrong, and because of her false arrest. Lesslie is suffering from an acute case Post-Traumatic Stress Disorder.

174.     The taking or depravation of Lesslie's liberty, by way of false arrest, constitutes a violation of her due process of law, and Defendants are liable to Lesslie for this because it has caused her serious damages.

## Dog Was Unnecessarily Killed Because HPD Knew Since 2018 of Their Existence and Failed to Bring Dog Tranquilizers

175.     At the time of the arrest, on January 10, 2019, there were two dogs living with the Plaintiffs in the Home, one of which was Max, the German Shepherd.

176.     Plaintiffs were the owners of Max. He was their best friend and their beloved pet and property.

177.     When the authorities went to execute the Arrest Warrant at the Home on January 10, 2019, they did not bring with them any dog tranquilizers.

178.     The members of the Task Force, including the defendants, had a duty to bring with them dog tranquilizers in order to reasonably prevent any harm to themselves and to Max, or the other dog at the Home.

179.     In fact, the authorities had been at the Home in May of 2018 and had observed there were two dogs, including Max.

180.     Based on information and belief, the HPD officers named defendants in this case had been at the Home where Lesslie and her family lived in May of 2018.

181.     During the detaining of Mario, believed to have been on May 22, 2018, the HPD officers who had participated specifically ordered Plaintiffs to place Max, the dog, in a secure place, and so Max was placed in the bathroom to please the officers.

182.     This prior intervention by HPD officers at the Home, and their previous

25

interaction with Max, is evidence that the Defendants had prior knowledge about the dog, Max, and should have properly planned and prepared for encountering him again in January 10, 2019.

183.    Based on information and belief, one of the HPD officers, believed to be one of the named defendants, even threatened to kill Max during said intervention of May 22, 2018, before he was placed in the bathroom.

184.    This shows that the Defendants were maliciously and recklessly pre-disposed to kill Max since May of 2018, in clear violation of Plaintiffs' due process rights.

185.    The HPD officers had enough reasonable information ahead of time about the location and circumstances surrounding the Home, including the dogs, to ensure the proper procedures were followed to secure the dogs at the Home by using tranquilizers, but they failed to do so.


### City of Houston's Policy and Practices Were the Moving Force Behind the Constitutional Violations Inflicted Against Plaintiffs

186.    The shooting of Max—a young German Sheppard—was not an isolated incident for Texas law enforcement.

187.    The shooting of Lesslie, an innocent bystander and third-party, was not an isolated incident for law enforcement.

188.    The false arrest of Lesslie and Michael, both innocent of wrongdoing and third-parties, were not isolated incidents.

189.    In fact, based on information and belief, in the last 10 years HPD has unnecessarily shot more than 200 people, killing a lot of them.

190.    Based on information and belief, in the last 10 years HPD has unnecessarily shot

and killed numerous innocent canines when conducting searches or arrests, instead of using dog tranquilizers, a safer alternative.

191.    Based on information and belief, more than one quarter of the individuals killed by HPD were unarmed when shot with firearms. The shooting and killing of unarmed individuals are indicative of the HDP's policies, practices, and procedures.

192.    This is also indicative of the HPD's deliberate indifference to the constitutional rights of Houston residents, which was again illustrated by the shooting of Lesslie and Max.

193.    Tellingly, for some unarmed individuals shot by HPD officers, the purported justification for the use of deadly force lack any objective or reasonable basis in fact, and constitute superficial excuses to cover-up the reality of repeated and consistent acts of gross, malicious and reckless violations of the constitutional rights of residents of Houston without due process of law.

194.    The HPD has also repeatedly failed to meet firearm training requirements recommended by national police agencies. In addition, at the time of the shooting of Max and Lesslie, the Department's excessive force also extend to HPD officers' unconstitutional use of an individual's race, both when deciding to detain an individual and when electing to use force. Hispanic or Mexican minorities, such as Lesslie and Michael, are statistically more likely to be arrested, harmed or killed by HPD officers than residents that are not minorities.

195.    As a consequence, and upon information and belief, the City's police officers frequently use race in their policing, both in determining when and whom to detain but also in their decisions to use force.

196.    HPD officers use race when determining to detain and use force against Hispanic minorities, and Black residents, in a manner disproportionate to their proportionate representation

in the population, illustrative of HPD's unconstitutional race-based practice.

197.    The City retains data regarding its police-involved shootings. That data indicates that HPD officers, pursuant to de-facto City policy and/or widespread practice, use deadly force against Hispanic and Mexican residents, as well as African-Americans, in a disproportionate, racially significant manner. The difference is not insignificant.

198.    A statistical profiling of every closed HPD officer-involved-shooting since 2005 suggested or concluded that black suspects were involved in the most total number of officer-involved shootings (comprising over 50% of the police-involved shootings), and that Hispanic and Black suspects had a much higher probability of being the targets of officer involved shootings than White or Asian suspects.

199.    As concerns stops made by HPD officers, the City maintains a de-facto, race-based policing system despite the fact that its own "Racial Profiling Reports."

200.    This is indicative of a City policy that targets said minorities.

201.    Efforts by the City Mayor or HPD Chief Art Acevedo to dispel this reality is a mere sham and an effort to deflect from the reality using publicity stunts, and without any real effort to effectuate change or improvement.

202.    Indeed, the City's own reports support an inference that race-based policing has occurred, owing to the fact that African-American individuals make up a disproportionate number of traffic stops, and searches conducted by HPD officers.

203.    It is believed, based on information, that the City's own data shows that Hispanic and Mexican minorities and African-Americans are statistically more likely to be searched following a stop in a disproportionately higher rate than other demographic groups.

204.    Despite these skewed results, in its "Racial Profiling Reports," the HPD maintains

that there is no statistically significant evidence of racial profiling against any racial or ethnic group in Houston.

205.   This Conclusion illustrates the City's deliberate indifference to its own race-based, and racially disproportionate police practices.

206.   Lesslie and her mom are both Mexican-born nationals.

207.   Michael and the minor, A.K.R., are both a Mexican-Americans.

**Plaintiffs' Damages**

208.   The Defendants' actions imposed substantial harm on Lesslie and her baby girl, A.K.R., starting on the day which Lesslie and Max were shot to this day.

209.   The amount of excruciating pain Lesslie felt the day she got shot in the arm is unquantifiable.

210.   To this day, Lesslie, A.K.R., and Michael are suffering the extreme sense of loss and pain that comes with being victims of violence. They are extremely emotionally distressed and depressed. They suffer from acute PTSD.   Their damages are tragic and substantial.

211.   In addition, the Plaintiffs miss the companionship of their dog, Max. It has been especially difficult and hard for Michael, who trained Max since he was a little puppy. Max slept in Michael's room every night. Michael has not had any other dog since Max in his life. He misses Max like he would miss a brother or a son. The loss of Max is immeasurable. His damages are tragic and substantial.

212.   A dog is often considered like another member of a human family. The loss of a dog is often devastating to families, and extremely painful.  It is the main reason why in our society dogs are historically considered "man's best friend." That's not a cliché. It's truly a reality, and in cases like this one it is a tragic reality when a beloved dog is unjustifiably killed.

## V.

## FEDERAL CAUSES OF ACTION

### Count One - 42 U.S.C. § 1983

### Excessive Deadly Force

213.    Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

214.    As described in the preceding paragraphs, the Defendants' actions, especially the actions of Officer Garza, toward Max (Michael's dog), Lesslie and A.K.R., violated their constitutional rights, including but not limited to those under the Fourth and Fourteenth Amendments of the United States Constitution.

215.    HPD has a custom and practice of using excessive and unjustified, deadly force when unnecessary. This policy, in addition to being apparent from statistical records, is further evidenced by the fact that HPD routinely attempts to cover-up its officers' unjustified use of excessive and deadly force and actively covered-up Officer's shooting of Max and Lesslie, despite being no sort of threat to him, or any officer involved in the arrest of January 10, 2019.

216.    By coercing Lesslie and Michael, falsely stating they were under arrest to intimidate them, expressly approving of and ratifying deadly use of force in unwarranted situations such as this one where a woman is simply holding a baby in her arms watching her dad being arrested and her dog is 35 feet away, sitting next to her to protect her, the Defendants have clearly embraced a policy of constitutional abuse and unjustifiable violence against residents of the City.

217.    By refusing to reprimand its officers following these incidents, and its proclivity to "turn a blind eye" to gross violations of constitutional rights, HPD has created a policy of brutality and excessive force. This practice is so pervasive as to have the force of law in the City of Houston.

Innocent bystanders and third-parties suffer the brutal effects of this violent, illegal, unconstitutional and immoral city policy.

218.    This policy of brutality, objectively-unreasonable excessive force and unjustified deadly force demonstrates a conscious indifference to the rights secured to citizens and non-citizens by the Fourth and Fourteenth Amendments. Officer Garza and other HPD officers who participated and falsely arrested and intimidated Plaintiffs, were all acting pursuant to and in conformity with this city policy, especially when Officer Garza and/or others unreasonably shot and killed Max, and shot and seriously injured Lesslie in the process. The foregoing city policy was the moving force and the proximate and producing cause of Max's injuries and death and of producing Lesslie's physical injuries and scars, as well as her (and her baby girl's) deep emotional anguish and suffering, to this day.

219.    Based on information and belief, neither Officer Garza nor other officers involved in the execution of the Arrest Warrant at issue were reprimanded or dismissed from duty as a result of this incident.

220.    The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others. In addition, the misconduct and excessive force described in this Count "shocks the conscience."

### Count Two— 42 U.S.C. § 1983

### Equal Protection

221.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

222.    In the manner described in this Complaint, Defendants violated Plaintiffs' constitutional rights intentionally subjecting them to unlawful, unequal treatment on the basis of their Mexican race, all in violation of the Fourteenth Amendment of United States Constitution.

31

223.    The Defendants' conduct created discriminatory effect by targeting Plaintiffs, who are Mexicans, for police action that is based on race.

224.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, maliciously, recklessly and with willful indifference to Plaintiffs' constitutional rights.

### Count Three- 42 U.S.C. § 1983

### Failure to Adequately Train

225.    Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

226.    The City of Houston failed to adequately train its officers in the following areas:

   a.   proper escalation of force,

   b.   when to appropriately use deadly force,

   c.   the proper force to use in response to a non-deadly, non-incapacitating threat,

   d.   the constitutional limits of the use of force,

   e.   how to properly and dispassionately confront potential dangers to the officer,

   f.   planning ahead of executing an arrest warrant,

   g.   planning and taking precautions concerning common and known contingencies, such as the presence of dogs.

227.    This policy of failing to adequately train its officers shows a conscious indifference by HPD to the rights secured by the Fourth and Fourteenth Amendments to the citizens of Houston and Lesslie, A.K.R. and Michael, in particular. The City's failure to properly train its officers is so reckless that misconduct by its officers was inevitable. This policy of inadequate training was a producing and proximate cause of Plaintiffs' damages and is so pervasive as to have the force of law.

## Violations of 42 U.S.C. § 1983 – Failure to Adequately Supervise

228.    Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

229.    The City of Houston and HPD has an established and negligent practice of failing to properly supervise its officers. This policy includes both the failure to inquire into the officers' daily activities and the City's failure to investigate and reprimand its officers for the use of excessive and unjustified, deadly force. Failing to supervise, like failing to reprimand, has resulted in tacit approval of excessive force and unjustified deadly force; if no one is watching the officers and the officers are not punished for unreasonably depriving others of their property, such as by unjustifiably killing one's dog or the shooting of innocent bystanders, then it is reasonable for the officers to assume that those actions are accepted by HPD. This practice is so widespread that officers do not fear punishment.

230.    In this case, the policy is clearly displayed and established in the fact that HPD officers had visited the Home in May of 2018 and had seen the German Shepheard, and had previously threatened to kill the dog unjustifiably. The supervisors of the HPD officers who went to the Home in May of 2018 failed to supervise, train, reprimand and help plan for another encounter with the same dog they again encountered on January 10, 2019, and unjustifiably shot at and injured (and eventually killed him).

231.    The failure of city officials to properly supervise its officers is so rampant that, as can be seen, the practice has the "force of law" for HPD officers; and this practice was the proximate and producing cause of Max's injuries and death, as well as the damages caused to Lesslie, her baby girl and Michael

## Count Four—42 U.S.C. § 1983

## Municipal Liability: Monell

232.    Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

233.    As described in the preceding paragraphs, the misconduct described in Counts I-III was undertaken under the policy and practice of the City of Houston, such that Defendant City of Houston is also liable, in that:

234.    As a matter of both policy and practice, the City of Houston encourages, and is thereby the moving force behind, the very type of misconduct at issue in Counts I-III by failing to adequately train, supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference;

235.    As a matter of both policy and practice, the City of Houston facilitates the very type of misconduct at issue in Counts I-III by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Houston police officers to believe their actions will never be meaningfully scrutinized. Accordingly, in that way, the City of Houston directly encouraging future uses of excessive deadly force, unlawful detention, failures to intervene, and race-based policing such as those Plaintiff complains of.

236.    Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Houston Police Department violate the constitutional rights of individuals in a manner similar to that alleged by Plaintiffs in Counts I-III on a regular basis, yet the Houston Police Department investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases.

237.    As a result of the City of Houston's policies and practices, and the unjustified and unreasonable conduct of the Defendant Garza, and other named Defendants, Plaintiffs have

suffered injuries, including severe emotional distress and pain and anguish.

## VI.

## STATE LAW CLAIMS—

## BROUGHT UNDER SUPPLEMENTAL STATUTE, 28 U.S.C. §1367

### Count Five–Violations of the Texas Tort Claims Act Against City

238.    Pursuant to Texas Civil Practices and Remedies Code §101.021 et. seq., the City is liable to Plaintiff for Lesslie's personal injuries, A.K.R.'s personal injuries, and Michael's property damage and personal injuries, as a result of the death of Max caused by Officer Garza's negligence in the misuse of tangible personal property belonging to the City of Houston while acting within the scope of his employment with the City of Houston. Specifically, Officer Garza was reckless and/or negligent in his use of his firearm against Max and Lesslie, and was further reckless and/or negligent in his use of his firearm against Lesslie, A.K.R. and Max during the incident. Officer Garza's negligent and/or reckless misuse of tangible personal property, as described herein, was the producing and proximate cause of Max's death and Plaintiffs' damages. If Officer Garza was a private person, he would be liable to Plaintiff for his negligent use of his firearm against Max and Lesslie, and therefore, the City is liable for Garza's negligent use of his firearm pursuant to §101.021 et. seq in *respondiat superior*.

239.    Also, other police officers included as defendants herein used tangible personal property belonging to the City of Houston while falsely arresting Lesslie and Michael, proximately causing them serious physical and emotional damages.

240.    Additionally,  other HPD officers herein joined to this lawsuit caused additionally pain and suffering and damages to Lesslie by forcing her to write a statement with her right arm, knowing full well that she had a bullet wound on that arm, causing her more pain and suffering.

241.     The minor, A.K.R., has also tremendously suffered emotional pain and suffering, and extreme and deep anguish, for which the City is liable.

**Count Six – Intentional Infliction of Emotional Distress and Bystander Liability**

242.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

243.     With their acts, the Defendants, in both their individual and official capacities, knew or should have known that they would cause serious infliction of emotional distress to the Plaintiffs.

244.     To recover damages for intentional infliction of emotional distress under Texas law, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.

245.     In this case, through their acts, which are described in this pleading, the named Defendants clearly acted intentionally and/or recklessly; their conduct was extreme and outrageous, as shooting at a domesticated dog 5 to 6 rounds of ammunition from far away, in a residential neighborhood, when women and babies were nearby, was extreme and outrageous; and these actions are the root and cause of the emotional distress caused to the Plaintiffs, which is severe in nature.

246.     What the Defendants did to the Plaintiffs, and Max, was beyond all possible bounds of decency, and is clearly atrocious, and utterly intolerable in a civilized community, such as is to be expected in the fourth largest city in the United States.

247.     Michael lost his best friend, Max, who was mortally wounded by the bullets shot at him on January 10, 2019, plus he was falsely arrested in the process having done nothing illegal or wrong.

248.     Lesslie was shot in the arm while holding her baby girl, and to this day suffers from

pain in her arm, and spine, and has to endure PTSD.

249.    And A.K.R., who was two-years-old, saw everything unfold in front of her eyes, was filled with blood, was separated from her mother abruptly, saw the injured dog bleeding and suffering, and to this day is incapable of interacting with other dogs, like she did before; and further cannot enjoy baths or pools because her grandmother had to cleanse her mother's blood from her clothes and body. A.K.R. suffered infliction of emotional distress as a bystander, and in her case it has been acutely affecting her because of the close relationships babies have with their mothers and A.K.R.'s mommy is suffering from acute PTSD, so the minor is also suffering from the same deep emotional affliction, to this day. Her mom, a victim, and the bystander baby, both suffer emotional trauma that is the result of the baby's contemporaneous perception of the events as they unfolded and has never been the same.


### Count Seven—Local Law Claim Indemnification

250.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

251.    The City of Houston must pay any tort judgment for damages rendered against Defendant Office Garza in his capacity as a Houston Police Department officer. Houston Code of Ordinances, Sec. 2-304.

252.    The City of Houston must pay any tort judgment for damages rendered against all other Defendants in their capacity as Houston Police Department officers. Id.

253.    During all times relevant to this complaint, Defendant Officer Garza, and the other named Defendants, were employees of the Houston Police Department, who acted within the scope of their employment with the City of Houston.

## VII.
## DAMAGES

254.    All of the Plaintiffs have sustained serious, permanent damages as a result of the

actions and/or omissions of Defendant described herein.  Accordingly, Plaintiffs are entitled to an

award of actual, compensatory damages and/or liquidated damages, including for past and the

future. Plaintiffs seeks an award of damages for their physical and mental anguish and pain and

suffering which they all suffered, and continue to suffer, and will suffer in the future.  At this time,

Plaintiffs believe their damages to be as follows:

> **Lesslie Rivera - $5,000,000 or greater.**

> **A.K.R., the minor - $2,000,000 or greater;**

> **Michael Rivera - $1,000,000 or greater**

**TOTAL COMPENSATORY DAMAGES = $8,000,000 or greater**

## VIII.
## PUNITIVE DAMAGES

255.    Plaintiffs would further show that the acts and omissions of the Defendants

complained of herein were committed with malice or reckless indifference to the protected rights

of the Plaintiffs.  In order to punish the Defendants for engaging in unlawful discrimination and

to deter such actions and/or omissions in the future, Plaintiffs also seek recovery of punitive or

exemplary damages.

## IX.
## ATTORNEY'S FEES

256.    The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b),

provides in relevant part, as follows: "In any action or proceeding to enforce a provision of

sections [1981 &1985], … the court, in its discretion, may allow the prevailing party, … a reasonable attorney's fee as part of the costs, ….."

257.    Pursuant to Section 1988(b) the Court should determine that the Plaintiffs are a prevailing party and award them reasonable attorney's fees as part of the costs, at the end of this case.

## X.
## JURY DEMAND

258.    Plaintiffs demand a jury on all issues to be tried in this matter and herein.

## XI.
## PRAYER

FOR THE REASONS SET ABOVE, Plaintiffs respectfully request that this Court enter judgment in their favor and against all named Defendants, awarding compensatory and punitive damages and attorneys' fees; and provide any other relief this Court deems just and appropriate.

Respectfully submitted,

**THE GONZALEZ LAW GROUP, PLLC**

/s/*Kevin Acevedo*
USDC Bar No. 2932922
The Gonzalez Law Group, PLLC
7151 Office City Drive, Ste. 200
Houston, Texas 77087
832-530-4070 Phone
832-530-4090 Fax
kevin@gonzalezlawgroup.net

**ATTORNEY FOR PLAINTIFF**

39